1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   FRED GRAVES,

11              Petitioner,              No. CIV S-04-1279 LKK GGH P

12        vs.

13   MIKE KNOWLES, et al.,               ORDER AND

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. Introduction

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  This action is proceeding on the original petition filed July

19   2, 2004.  Petitioner challenges his conviction of a prison disciplinary for distribution of a

20   controlled substance in violation of Cal. Code of Regs. tit. 15, § 3016.  After carefully reviewing

21   the record, the court recommends that the petition be denied.

22              On February 15, 2005, the court ordered petitioner to show cause why this action

23   should not be dismissed for lack of jurisdiction.  It appeared that petitioner was no longer "in

24   custody" for this conviction when he filed this action.  Maleng v. Cook, 490 U.S. 488, 490, 109

25   S. Ct. 1923, 1925 (1989) (per curiam) (quoting 28 U.S.C. § 2241(c)(1)).  On March 28, 2005,

26   petitioner filed a response to the show cause order.  After carefully reviewing the record, the

1

1  court finds that petitioner meets the custody requirement because he was still required to attend

2  Alcoholics Anonymous and Narcotics Anonymous as punishment for his conviction when he

3  filed this action.  See Dow v. Circuit Court of the First Circuit, 995 F.2d 922, 923 (9th Cir. 1993)

4  (per curiam) (a sentence of 14 hours of attendance at an alcohol rehabilitation program renders

5  someone "in custody.").  Accordingly, the February 15, 2005, order to show cause is discharged.

6          On March 31, 2005, petitioner filed a motion to amend his response to the show

7  cause order and a request to hold this action in abeyance.  On May 26, 2005, petitioner filed a

8  motion to file another amendment to his response to the show cause order and a request to

9  withdraw the motion to hold this action in abeyance.  Because the show cause order is

10  discharged, these motions are denied as unnecessary.

11  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

12          The AEDPA "worked substantial changes to the law of habeas corpus,"

13  establishing more deferential standards of review to be used by a federal habeas court in

14  assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

15  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

16          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

17  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

18  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

19  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

20  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

21  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

22  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

23  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

24          "Unreasonable application" of established law, on the other hand, applies to

25  mixed questions of law and fact, that is, the application of law to fact where there are no factually

26  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

1    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

2    AEDPA standard of review which directs deference to be paid to state court decisions.  While the

3    deference is not blindly automatic, "the most important point is that an *unreasonable* application

4    of federal law is different from an incorrect application of law....[A] federal habeas court may not

5    issue the writ simply because that court concludes in its independent judgment that the relevant

6    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

7    that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

8    1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

9    objectively unreasonable nature of the state court decision in light of controlling Supreme Court

10   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

11         The state courts need not have cited to federal authority, or even have indicated awareness

12   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

13   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

14   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

15   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

16   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

17   established Supreme Court authority reviewed must be a pronouncement on constitutional

18   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

19   binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

20         However, where the state courts have not addressed the constitutional issue in

21   dispute in any reasoned opinion, the federal court will independently review the record in

22   adjudication of that issue.  "Independent review of the record is not de novo review of the

23   constitutional issue, but rather, the only method by which we can determine whether a silent state

24   court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

25   2003).

26   \\\\\

1    In reviewing a state court's summary denial of a habeas petition, the court "looks

2 through" the summary disposition to the last reasoned decision. <u>Shackleford v. Hubbard</u>, 234

3 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04, 111 S.

4 Ct. 2590 (1991)).  In the instant case, the Sacramento County Superior Court issued a reasoned

5 decision addressing petitioner's claim that there was not sufficient evidence to support his

6 conviction.[1]  The California Court of Appeal and California Supreme Court issued opinions,

7 without reasons, denying petitioner's state habeas petitions.  Accordingly, as to petitioner's

8 sufficiency of evidence claim, the court looks through to the reasoned decision of the Superior

9 Court to determine whether its decision was contrary to or an unreasonable application of

10 Supreme Court authority.  As to the remaining claims, for which there is no reasoned opinion, the

11 court conducts an independent review of the record.

12 III.  <u>Discussion</u>

13    In order to put petitioner's claims in context, the court will set forth the

14 background information contained in petitioner's rules violation report:

15    On April 8, 2002, at 2104 hours, Correctional Officer C. Weston conducted a
random cell search of 5B-AA-1-05 solely occupied by inmate COLLINS, I., C-
16 23149 and GRAVES, F., B-59365.  At 2115 hours, Inmates GRAVES and
COLLINS were escorted to the Custody Complex and placed into holding cells.
17 At 2115 hours, Officer Weston performed a search of cell AA-1-05.  At 2145
hours Officer Weston removed the base from a "Windmere" electric fan, located
18 at the left foot/leg, of the bottom bunk in cell AA-1-05.  Inside the base of the fan
were three bindles of a dark brown, tar like substance wrapped in cellophane.  At
19 2235 hours, Officer Weston performed a Narcotics Identification Systems Field
Test (NIK) utilizing test A,Lot #9911-5, and test B,Lot #9706-2.  Bindle # 1
20 weighed 1.1 grams before testing and 1.0 grams after testing. All tests were
presumptive positive for heroin.  The total weight including cellophane before
21 testing was 3.9 grams and 3.6 grams after testing.

22    At 2335 hours, Officer Weston advised COLLINS of his Miranda Rights pursuant
to the Miranda Decision.  COLLINS waived his right to remain silent and made a
23 statement.  At 2345 hours, Officer Weston advised GRAVES OF HIS Miranda
Rights pursuant to the Miranda Decision.  GRAVES waived his right to remain
24 silent and made a statement.

25

26    [1]  The Superior Court also addressed the merits of a claim not raised in this petition.

At 2355 Officer Weston collected a urine sample from COLLINS and placed it into evidence locker # 7.  On March 9, 2002, at 1535 hours, Officer Weston collected a urine sample from GRAVES and placed it into evidence locker # 8.  Both inmates were asked if they would waive all testing by the contracted laboratory in this matter and admit guilt.  Both inmates refused.

The Heroin, fan and pictures (prints as well as 1.44 MB floppy disc) were all labeled by Officer Weston and placed into evidence locker # 7 located in the Custody Complex. Bindle # 3 weighed approximately 1. 6 grams, including the clear cellophane wrapping.  All three bindles weighed approximately 3.9 grams total, including the clear cellophane wrapping.  At approximately 2235 hours, I performed a Narcotics Identification System Field test (NIK) on a small portion of bindle # 1.  Test "A," lot # 9911-5, indicated opium alkaloids with a purple color change.  I then utilized Test "B," lot # 9706-2, to confirm the type of opium alkaloids.  Test "B" proved presumptively positive for Heroin with a yellow to increasing darker color change.  I tested bindle # 2 using test "B" only. Test "B" on bindle # 2 proved presumptively positive for Heroin with a yellow to increasing darker yellow test "B" only.  I tested bindle # 3 using test "B" only. Test "B" on bindle # 3 proved presumptively positive for Heroin with a yellow to increasing darker yellow color change. At approximately 2310 I positively identified inmates Graves and Collins by their inmate identification cards.  At approximately 2335 hours, I read inmate Collins, C-23149 his Miranda Rights pursuant to the Miranda Decision.  Inmate Collins acknowledged his rights, signed the Notice of Rights form and elected to answer the following questions. Question # 1 "Do you know what was found in the cell." Inmate Collins answered "No" Question # 2 "Do you own any fans in cell 5-AA1-05."  Inmate Collins answered "No."  Question # 3 "Do you know who owns the broken white fan in your cell."  Inmate Collins answered "My cellie told me that was his fan."  I then informed inmate Collins of the discovery of heroin in his assigned cell and that pursuant with Director's rule 3290(e) I asked him if he would waive all testing by the contracted laboratory in this disciplinary matter and admit guilt. Inmate Collins refused to sign the Nik Drug Screen Test Report.  At approximately 2345 hours, I read inmate Graves, B-59365 his Miranda Rights pursuant to the Miranda Decision.  Inmate Graves acknowledged his rights, signed the Notice of  Rights form and elected to answer the following questions. Question # 1 "Who owned the broken white fan in your cell 5-AA1-05."  Inmate Graves answered "I just bought the fan.  It was under my bed."  Question #2 "Who did you buy the fan from." Inmate Graves refused to answer this question. Question # 3 "When did you buy the fan."  Inmate Graves answered, "Last Monday, April 1st."  Question # 4 "Did you know about the heroin inside the fan."  Inmate Graves answered, "No, I just bought it.  The fan was completely mine.  I bought it off the tier for $1.00.  It didn't work.  My cellie didn't know about it."  I then informed inmate Graves of the discovery of heroin in his assigned cell and that pursuant with Director's Rule 3290(e) I asked if he would waive all testing by the contracted laboratory in this disciplinary matter and admit guilt.  Inmate Graves refused to sign the NIK Drug Screen Test Report.  At approximately 2355 hours, I ordered inmate Collins to supply a urine specimen. Inmate Collins complied with my order. The urine sample was labeled with the date "4/08/02", my initials "CLW" and Badge # "38284" and secured in evidence locker # 7 located in the Custody Complex. I then completed an Evidence Envelope, secured the heroin inside a ziplock type plastic bag, labeled with a

5

1     piece of evidence tape with the date "4/09/02" my initials "CLS" and Badge #
        "38284" and placed it in the same envelope.  I also labeled the white plastic fan
2     with a piece of evidence tape with the date "4/08/02" my initials "CLW" and
        Badge # "38284."  I also secured the white plastic fan in evidence locker # 7.  All
3     evidence was secured and locked in evidence locker # y on 4/09/02 at 0330 hours.
        On April 9, 2002 at approximately 1535 hours, I ordered inmate Graves to supply
4     a urine specimen.  Inmate Graves complied with my order.  The urine sample was
        labeled with the date "4/09/02," my initials "CLW" and Badge # "38284" and
5     secured in evidence locker # 8, located in the Custody Complex.

6 Answer, Exhibit 3.

7     The Rules Violation Report describes what occurred at the disciplinary hearing:

8     On Sunday, July 21, 2002, at approximately 2000 hours, Inmate GRAVES was
        reminded of his rights pursuant of Miranda Decision and agreed to participate in
9     this hearing.  Inmate GRAVES who on 5/16/02, requested his hearing be
        postponed pending District Attorney's Referral, revoked the request on June 22,
10    2002.  Due to an Administrative Error, the hearing was not conducted until July
        21, 2002, which does not meet the thirty day time constraints mandated by CCR
11    3320(a). Therefore, the forfeiture of credits as a penalty for the misconduct is
        prohibited.  All other time constraints were adhered to and all other due process
12    was afforded.  As noted in the reporting employee's written report Inmate
        GRAVES is not a participant in the mental Health Services Delivery System.
13    Inmate GRAVES meets the criteria for the assignment of an Investigative
        Employee.  Officer M. Feryance assumed those duties as his report, which was
14    carefully reviewed by the SHO contained on the CDC 1150A.  Inmate GRAVES
        does not meet the criteria for the assignment of a Staff Assistant (SA) per CCR
15    3315(d)(2).  Inmate GRAVES requested Lieutenant J. Valencia, Sergeant S.
        Rowan, Officer Meadows, Officer McCoy, Officer Shambre and the Reporting
16    Employee Officer, C. Weston, as witnesses at this hearing.
        The following witnesses were denied by the Senior Hearing Officer: Officer
17    Meadows, Officer McCoy and Officer Shambre as Inmate GRAVES was unable
        to demonstrate that these witnesses had relevant or additional information to offer
18    in this hearing per 3315(e)1B.  No confidential information was provided or
        reviewed in the adjudication of this disciplinary hearing.  The charges were read
19    to Inmate GRAVES he acknowledged understanding the charges, pled "NOT
        GUILTY" and chose to remain silent.

20

21    At this time the SHO asked Inmate GRAVES the following questions:

22    SHO: Was the heroin found in the fan yours?

23    I/M GRAVES: No.

24    SHO: How did you come by the fan?

25    I/M GRAVES: I bought it for a dollar.

26    SHO: From whom did you buy the fan?

1    I/M GRAVES: I'm not telling you.

2    SHO: What currency did you use?

3    I/M GRAVES: Soups.

4    SHO: Did your cell partner ever use the fan?

5    I/M GRAVES: No.

6    SHO: Do you use heroin?

7    I/M GRAVES: No.

8    At this time the SHO called Sergeant Rowan as a witness:

9    SHO: Are you familiar with this inmate and the RVR being adjudicated here
     today?

10   Sgt. Rowan: Yes.

11

12   At this time Inmate GRAVES asked Sgt Rowan the following question:

13   I/M GRAVES: Did you give Officer Weston permission to search my cell?

14   Sgt. Rowan: No, I did not.

15   SHO: Is it your expectation that an officer must get permission to search an
     inmate's cell?

16

17   Sgt. Rowan: No.

     At this time, via speaker telephone, Inmate GRAVES asked Officer Weston the

18   following questions:

19   I/M GRAVES: Why wasn't the rest of the cell searched?

20   C/O Weston: It was searched.

21   I/M GRAVES: Do you still have the bindle material?

22   C/O Weston: It was all placed in the evidence envelope.

23   I/M GRAVES: Did another officer tell you I was selling drugs?

24   C/O Weston: There may have been a rumor.  I have no idea.

25   SHO: Did this rumor prompt your cell search?

26   C/O Weston: No, I had heard it several weeks ago.  This was a routine search.

I/M GRAVES: You said at another hearing that you searched it on a hunch.  Was it searched on a hunch?

C/O Weston: Yes.

SHO: Are you stating that you used confidential information to prompt the search?

C/O Weston: No, it was still picked randomly.

I/M GRAVES: Was there dust on the tape that held the wrapping material?

C/O Weston: I don't recall.

SHO: Officer Weston, I'm having a problem reconciling whether or not this was a random search or whether confidential information was used in choosing this cell for a search.  Would you clarify this point for me?

C/O Weston: It was random.  I had no probable cause.  I had some time and it was a good time to search some cells.

At this time the SHO asked Lieutenant Valencia the following question:

SHO: Are you familiar with Inmate GRAVES' RVR for Distribution of Controlled Substance?

Lt. Valencia: Yes.

At this time Inmate GRAVES asked Lieutenant Valencia the following questions:

I/M GRAVES: Were you told they would be looking for drugs?

Lt. Valencia: No.

I/M GRAVES: Did you help with the search?

Lt. Valencia: No.

I/M GRAVES: Were you present during the search?

Lt. Valencia: No.

FINDING: Inmate GRAVES was found GUILTY of violating CCR # 3016(c) DISTRIBUTION OF A CONTROLLED SUBSTANCE (HEROIN).  The preponderance of the evidence submitted at the hearing does substantiate the charge.  The following were considered:

1.  The reporting employee's written report, which describes his actions as he discovered what he believed to be a controlled substance discovered in a fan

8

located in Cell 5/AA1-05, to which Inmate GRAVES was assigned on April 8, 2002.

2.  The Controlled Substance Analysis Report received from Sacramento County Laboratory of Forensic Services (Lab No. -2-03607-001) on May 7, 2002, which determined that the substance discovered by the reporting employee was heroin.

3.  The total weight of the heroin (as determined by the above mentioned report) was 3.05 grams.  This amount in an institutional setting is more than one inmate would have available for personal use.  The basis for this determination in the Senior Hearing Officer's seven years experience in conducting Serious CDC 115 hearings and over nineteen years as a Correctional Employee.

4.  The fact that there were three separate bindles, which would indicate that the bindles were for more than one person's use and is typical of how heroin is packaged for sale, not personal usage.  This determination was made on the same basis as Finding No. 3.

Answer, Exhibit 5.

The petition raises eleven claims.

A.  <u>Claim 1: Denial of Witnesses; Claim 6: Limit of Questions</u>

The background to these claims is as follows.  Petitioner claims that he appeared before Lieutenant Adams for his disciplinary hearing on July 21, 2002.  Pet., Statement of Fact, p. 2: 6-7.  Petitioner contends that his request to call Officers McCoy, Shampre and Meadows was initially denied, although they had participated in the search of his cell.  <u>Id.</u>, p. 2: 9-11.

Officer Weston participated at the hearing via telephone.  <u>Id.</u>, p. 2: 10-13. Petitioner was permitted to ask Officer Weston six questions.  <u>Id.</u>, p. 2: 12-13.  Petitioner's request to call inmate Collins as a witness was not addressed.  <u>Id.</u>, p. 2: 17-20.

Sergeant Rowan also appeared as a witness at the hearing.  <u>Id.</u>, p. 2: 19-20. Lieutenant Valencia appeared as a witness via telephone.  <u>Id.</u>, p. 2: 20-22.  When petitioner questioned Lieutenant Valencia, he mistakenly thought he was Officer Shampre or McCoy.  <u>Id.</u>, p. 2: 21-24.  Based on this misunderstanding, petitioner asked Lieutenant Valencia questions regarding the cell search, although Lieutenant Valencia had not participated in the search.  <u>Id.</u>, p. 2: 23-24.

\\\\\

At the hearing, Sergeant Rowan told Lieutenant Adams that each staff member involved in a cell search must prepare their own report of the incident.  Id., p. 3: 7-9.  Based on this response, Lieutenant Adams tried to call Officer Shampre, Meadows and McCoy on the phone with no luck.  Id., p. 3: 9-11.  Lieutenant Adams then postponed the hearing so that these officers could be present.  Id., p. 3: 11-13.

On July 25, 2002, Officer Feryance told petitioner that Lieutenant Adams said that if petitioner waived his witnesses, they could conclude the hearing on July 26, 2002.  Id., p. 3: 15-16.  Petitioner told Officer Feryance that he wanted his witnesses.  Id., p. 3: 16-17.  On July 31, 2002, petitioner was escorted to the hearing room.  Id., p. 3: 17-18.  At that time, Lieutenant Adams told petitioner that his request for witnesses was denied and backdated the rules violation report to indicate that the hearing concluded on July 21, 2002.  Id., p. 3: 18-20.

Under the Fourteenth Amendment's Due Process Clause, a prisoner is entitled to certain due process protections when he is charged with a disciplinary violation.  Wolff v. McDonnell, 418 U.S. 539, 564-571, 94 S. Ct. 2693, 2978-2982 (1974).  Such protections include the limited right to call witnesses, to present documentary evidence and to have a written statement by the factfinder as to the evidence relied upon and the reasons for the disciplinary action taken.  Id.  Prison officials may deny witnesses where their testimony would unduly extend the hearing or be unnecessary.  Id.

The Rules Violation Report does not reflect petitioner's request to call inmate Collins as a witness.  Therefore, this request apparently went unaddressed.  However, as noted by respondent, this oversight did not prejudice petitioner given his admission of ownership of the fan.  In the traverse, petitioner argues that there was "much information" that Collins could have provided to petitioner's defense.  Traverse, p. 36: 3-4.  The only specific information that petitioner describes inmate Collins as having been able to testify to concerns Officer Weston's testimony at Collins's May 14, 2002, suitability hearing.  For the reasons discussed below, this testimony was not relevant to petitioner's defense.

1    Petitioner contends that at inmate Collins's suitability hearing, Officer Weston

2    testified that he searched the cell because another officer had told him that petitioner was selling

3    drugs to pay off a gambling debt.  Officer Weston's motive in searching petitioner's cell was not

4    relevant to petitioner's guilt or innocence.  Hudson v. Palmer, 468 U.S. 517, 530 (1984)

5    (prisoners do not retain any Fourth Amendment protections against unreasonable searches in

6    their cells).  Lieutenant Adams did not rely on any confidential information received by Officer

7    Weston regarding petitioner's activities.  See Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir.

8    1987) (per curiam) ( a disciplinary decision based on statement of an unidentified inmate

9    informant satisfies due process if 1) the record contains some factual information which the

10   committee can reasonably conclude that the information was reliable; and 2) the record contains

11   a prison official's affirmative statement that safety considerations prevent the disclosure of the

12   informant's name.")  Accordingly, the testimony of inmate Collins regarding statements made by

13   Officer Weston at his suitability hearing was unnecessary.

14   Petitioner contends that on July 31, 2002, Lieutenant Adams denied his request to

15   call Officers McCoy, Shampre and Meadows as witnesses apparently because they were

16   unavailable.  As discussed above, petitioner claims that Lieutenant Adams had postponed the

17   hearing after realizing that these officers had prepared reports based on their participation in the

18   search.  Petitioner argues that because these officers participated in the search, they had relevant

19   information.  Respondent disputes this point, claiming that Officers Meadows and Shambre

20   simply escorted petitioner from the cell during the search.

21   If petitioner's version of events is correct, then Lieutenant Adam's decision

22   denying petitioner's request to call Officers Meadows, Shambre and McCoy as witnesses—after

23   he had in effect granted the request—violated petitioner's right to due process because the

24   decision was based simply on the temporary unavailability of these witnesses.  However, for the

25   following reasons, this error was harmless.  An error of constitutional magnitude is harmless if it

26   did not have a "substantial and injurious effect" on the decision-maker's verdict.  Brecht v.

11

1   Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 1721 (1993).

2          Petitioner has not demonstrated that Officers Meadows, Shambre or McCoy

3   would have provided any testimony exonerating him of the offense.  While petitioner admitted

4   ownership of the fan, he denied ownership of the heroin.  Petitioner's defense was apparently that

5   the heroin belonged to another inmate, other than inmate Collins.  The only person who had any

6   probative evidence regarding where the heroin came from was petitioner because he knew who

7   owned the fan prior to him.  However, he refused to divulge this information.

8          Moreover, petitioner's defense was improbable—not many inmates would sell to

9   another inmate for $1 a fan whose base was full of heroin.  Officers Meadows, Shambre and

10  McCoy clearly had no knowledge regarding who owned the fan prior to petitioner.  Their

11  testimony regarding the circumstances of the search would have been cumulative to evidence and

12  testimony already presented at the hearing.  Under these circumstances, the failure of these

13  officers to testify did not have a substantial and injurious effect on the decision-maker's verdict.

14         Petitioner also contends that his right call witnesses was violated because when he

15  questioned Lieutenant Valencia over the telephone, he mistakenly thought he was Officer

16  Shampre or McCoy.  Based on this misunderstanding, petitioner asked Lieutenant Valencia the

17  wrong questions.  Petitioner claims that Lieutenant Adams did not tell him that he was talking to

18  Lieutenant Valencia.

19         Attached to the petition as exhibit G is a copy of the questions petitioner intended

20  to pose to his witnesses.  Petitioner had two questions for Lieutenant Valencia:

21              1.  Were you the Lieutenant that during a state of emergency lockdown gave
                Officer Weston permission to search [petitioner's cell] once you were informed
22              there might be drugs there?

23              2.  Were you the Lieutenant that ordered Graves and Collins to be placed in
                custody holding cells and stripped during the cell search?
24

25         Nothing in the record suggests that Lieutenant Adams intentionally sought to

26  mislead petitioner regarding whom he was questioning.  In any event, the answers to these

questions would not have assisted petitioner's defense.  In other words, the answers to these two questions would not have shed light on who, other than petitioner, the heroin belonged to.  Assuming petitioner's confusion regarding the identity of Lieutenant Valencia resulted in a denial of right to questions witnesses, any error was harmless.

Petitioner also contends that his right to call witnesses was violated because he was only permitted to ask Officer Weston six questions.  Attached to the petition as exhibit G is a list which includes the eleven questions that petitioner wanted to ask Officer Weston.  The five questions that petitioner chose not to ask Officer Weston are the following:

1. If a state of emergency suspends any nonessential operation and procedure or function, and you knew that 5 bldg cells was searched not later than 4-06-02 and 5 bld inmates were on lockdown on 4-08-02 why was there a need to search 5-AA-1-05 again.

2. Where do you place inmate's during a routine search.

3. Why were we handcuffed and placed in custody holding cells and stripped before cell search began.

4. Why wasn't the other two fans searched.

5. Am I guilty of stealing your flashlight (I found it in my cell).

The answer to these questions would not have assisted petitioner in his defense.  These questions did not shed light on which inmate, other than petitioner, owned the fan.  Accordingly, Lieutenant Adams's decision to allow petitioner to ask Officer Weston six questions did not violate petitioner's right to due process.

Finally, in his traverse petitioner argues that because he was handcuffed during his hearing, he should have been assigned a staff assistant to help him.  In particular, petitioner claims that because he did not have use of his hands, a guard had to mark off for him the six questions that he was permitted to ask the witnesses.  The court construes this claim to implicate petitioner's right to call witnesses.  The inconvenience petitioner suffered as a result of being handcuffed in a prison setting did not prevent him from asking the witnesses questions.  Although it was not convenient for petitioner to have a guard mark the questions he intended to

1  ask the witnesses, this situation did not prevent him from choosing his six questions and asking

2  them.  Accordingly, the court finds that petitioner's right to call witnesses was not denied as a

3  result of him being handcuffed during the hearing and not being assigned a staff assistant.

4          After independently reviewing the record, the court finds that the state court

5  decisions denying these claims were neither contrary to nor an unreasonable application of

6  Supreme Court authority.  Accordingly, these claims should be denied.

7          B.  <u>Claim 2: Biased Hearing Officer</u>

8          Petitioner contends that the hearing officer, Lieutenant Adams, was biased against

9  him because he had earlier presided over inmate Collins's disciplinary hearing for charges

10  relating to the heroin.  Because Lieutenant Adams found Collins not guilty, petitioner argues that

11  he had predetermined petitioner's guilt by the time he presided over petitioner's hearing.

12          Due process requires a non-biased decision-maker.  <u>Wolff</u>, 418 U.S. at 570-71, 94

13  S. Ct. at 2981-82.  Because Lieutenant Adams had presided over inmate Collins's disciplinary

14  hearing did not mean that he had predetermined petitioner's guilt.  If Lieutenant Adams had

15  predetermined petitioner's guilt, he would not have questioned Officer Weston as closely as he

16  did regarding whether the search of petitioner's cell was random.

17          After independently reviewing the record, the court finds that the state court

18  decisions denying these claims were neither contrary to nor an unreasonable application of

19  clearly established Supreme Court authority.  Accordingly, this claim should be denied.

20          C.  <u>Claims 3, 9:  Denial of Non-Confidential Reports and Evidence</u>

21          In claim 3, petitioner argues that his right to due process was violated when prison

22  officials refused to provide him with a copy of the report from inmate Collins's May 14, 2002,

23  parole suitability hearing where Officer Weston allegedly testified that another officer had told

24  him that petitioner was selling drugs to pay off a gambling debt.  Petitioner also claims that the

25  bindle of drugs was wrapped in a medical slip that contained the name and CDC # of an inmate.

26  Petitioner argues that prison officials violated his right to due process by refusing to turn over

1   this document to him.  Petitioner also argues that prison officials violated his right to due process

2   by denying him access to the results of the urine tests of inmate Collins and himself.

3            "The due process requirements for a prison disciplinary hearing are in many

4   respects less demanding than those for criminal prosecution, but they are not so lax as to let stand

5   the decision of a biased hearing officer who dishonestly suppresses evidence of innocence."

6   Edwards v. Balisok, 520 U.S. 641, 647, 117 S. Ct. 1584, 1588 (1997).  Petitioner is claiming that

7   prison officials suppressed evidence that demonstrated his innocence.

8            The evidence listed above did not demonstrate petitioner's innocence.  As

9   discussed above, evidence that Officer Weston testified in inmate Collin's suitability hearing that

10  he heard that petitioner was selling drugs to pay off a gambling debt went to why he searched

11  petitioner's cell.  This evidence did not aid petitioner in proving that the heroin did not belong to

12  him.  Evidence of the results of the urine tests also would not have conclusively proved that

13  petitioner was not selling drugs.  Lieutenant Adams found that the amount of drugs in

14  petitioner's cell was more than for personal use.  Petitioner's admission that the fan was his, and

15  that his cellmate had not used the fan, undercuts petitioner's contentions.

16           Finally, evidence that another inmate's name was contained on the medical slip

17  may have been relevant to proving which inmate, other than petitioner, owned the heroin.

18  However, as discussed above, petitioner knew who sold him the fan and yet refused to identify

19  this inmate.  Under these circumstances, the information on the medical slip was not relevant.

20           In claim 9, petitioner claims that Lieutenant Adams taped the July 21, 2002, and

21  July 31, 2002, disciplinary hearings.  Petitioner claims that Lieutenant Adams destroyed the tape

22  recording after the hearing even though petitioner had requested a copy of it.  Petitioner's right to

23  due process in connection with his disciplinary hearing does not include the right to a copy of the

24  tape recording of the hearing.

25           After independently reviewing the record, the court finds that the state court

26  decisions denying these claims were neither contrary to nor an unreasonable application of

15

1    Supreme Court authority. Accordingly, these claims should be denied.

2                       D. <u>Claim 4: Guilty Finding not Supported by Some Evidence</u>

3              Petitioner contends that his conviction was not supported by sufficient evidence.

4    Petitioner was convicted of violating Cal. Code Regs. tit. 15 § 3016(c) which provides that

5    inmates shall not distribute, as defined in section 3000, any controlled substance or controlled

6    medication.  Section 3000 defines distribution as "the sale or unlawful dispersing, by an inmate

7    or parolee, of any controlled substance; or the solicitation of or conspiring with others in

8    arranging for, the introduction of controlled substances into any institution, camp, contract health

9    facility, or community correctional facility for the purpose of sales or distribution.

10             The Superior Court denied this claim on the following grounds:

11         The standard of review for sufficiency of the evidence in prison disciplinary
      hearings is the "some evidence" test.  (<u>Superintendent v. Hill</u> (1985) 472 U.S.
12         445.)  As long as there is a "modicum" of evidence to support the charges, the
      decision must be upheld.
13

14         The critical evidence in this case concerned possession and control of heroin
      found in the cell.  "[T]he elements of possession of narcotics are physical or
15         constructive possession thereof coupled with knowledge of the presence and
      narcotic character of the drug...Constructive possession occurs when the accused
16         maintains control or a right to control the contraband; possession may be imputed
      when the contraband is found in a place with is immediately and exclusively
17         accessible to the accused and subject to his dominion and control, or to the joint
      dominion and control of the accused and another.  The elements of unlawful
18         possession may be established by circumstantial evidence and any reasonable
      inferences drawn from such evidence."  (<u>People v. Williams</u> (1971) 5 Cal.3d
19         211.)

20         In this case the heroin was found in wrapped plastic packages in a fan that
      petitioner admitted he owned.  The fan was accessible to both him and his
21         cellmate.  The circumstances are sufficient to supply some evidence supporting
      the disciplinary finding.

22   Answer, Exhibit 8.

23             Petitioner argues that his conviction is not supported by some evidence because

24   no drugs were found on his body and because no one saw him selling drugs.  While petitioner did

25   not actually possess the heroin on his body, it was found in a fan that belonged to him.  In

26   addition, the amount of heroin and the way it was packaged reasonably suggested that it was

16

1  intended for sale.  Because heroin cannot realistically be manufactured from opium in a prison

2  setting, it is beyond doubt that petitioner conspired with others to possess heroin for sale.  Under

3  these circumstances, there was some evidence to support his conviction of distribution of a

4  controlled substance.

5        The denial of this claim by the Superior Court was neither contrary to nor an

6  unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

7  should be denied.

8        E.  Claim 5:  Violation of Miranda

9        Petitioner argues that Lieutenant Adams questioned him at the disciplinary

10  hearing even though he invoked his right to remain silent after being advised of his rights

11  pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).  Under Miranda, a person

12  in custody must be informed before interrogation that he has a right to remain silent and to have a

13  lawyer present.  Id.  The rules violation states both that petitioner waived his Miranda rights and

14  decided to speak at the hearing and that he invoked his Miranda rights and chose not to speak.

15        This court is aware of no clearly established Supreme Court authority holding that

16  prison officials are required to admonish prisoners of their right to remain silent prior to prison

17  disciplinary hearings.  In fact, the Supreme Court has held that Miranda has no "substantial

18  bearing on the question of whether counsel must be provided at '[p]rison disciplinary hearings

19  [which] are not part of a criminal prosecution.'" Baxter v. Palmigiano, 425 U.S. 308, 315, 96 S.

20  Ct. 1551, 1556 (1976).  The Baxter court went on to conclude "[w]e see no reason to alter our

21  conclusions so recently made in Wolff that inmates do not 'have a right to either retained or

22  appointed counsel in disciplinary hearings' 418 U.S. at 570, 94 S.Ct. at 2981." Id. at 315, 96

23  S.Ct. at 1556.

24        Because no clearly established Supreme Court authority required that petitioner

25  receive the Miranda advisement regarding his right to remain silent prior to testifying at his

26  disciplinary hearing, this claim is without merit.  This court also suspects that the statement in the

17

1  rules violation report that petitioner invoked his <u>Miranda</u> rights and chose not to speak was

2  clerical error.

3  After independently reviewing the record, the court finds that the state court

4  decisions denying this claim were neither contrary to nor an unreasonable application of clearly

5  established Supreme Court authority.  Accordingly, this claim should be denied.

6  F.  <u>Claim 7: Denial of Fair Appeal Process</u>

7  Petitioner contends that his administrative appeal following his conviction for the

8  at-issue disciplinary was not properly investigated.  Inmates lack a separate constitutional

9  entitlement to a specific prison grievance procedure.  <u>Ramirez v. Galaza</u>, 334 F.3d 850, 860 (9th

10  Cir. 2003).

11  After independently reviewing the record, the court finds that the state court

12  decisions denying this claim were neither contrary to nor an unreasonable application of clearly

13  established Supreme Court authority.  Accordingly, this claim should be denied.

14  G.  <u>Claim 8: Illegal SHU Term</u>

15  Petitioner contends that prison officials violated his right to due process because

16  they did not have authority to assess an 8 month Security Housing Unit (SHU) term for his

17  conviction for distribution of narcotics.  Petitioner is alleging a violation of state law.

18  A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis

19  of some transgression of federal law binding on the state courts.  <u>Middleton v. Cupp</u>, 768 F.2d

20  1083, 1085 (9th Cir. 1985); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is

21  unavailable for alleged error in the interpretation or application of state law.  <u>Middleton v. Cupp</u>,

22  768 F.2d at 1085; <u>see</u> also <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir. 1987); <u>Givens v.</u>

23  <u>Housewright</u>, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state

24  issues de novo.  <u>Milton v. Wainwright</u>, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

25  The Supreme Court has reiterated the standards of review for a federal habeas

26  court.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 112 S. Ct. 475 (1991).  In <u>Estelle v. McGuire</u>, the

1   Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

2   granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

3   evidence was incorrectly admitted under state law since, "it is not the province of a federal

4   habeas court to reexamine state court determinations on state law questions."  Id. at 67-68, 112 S.

5   Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

6   state law."  Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092,

7   3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

8   may not grant habeas relief where the sole ground presented involves a perceived error of state

9   law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

10  Protection clauses of the Fourteenth Amendment).

11          The Supreme Court further noted that the standard of review for a federal habeas

12  court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

13  the United States (citations omitted)."  Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

14  order for error in the state trial proceedings to reach the level of a due process violation, the error

15  had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

16  defined the category of infractions that violate "fundamental fairness" very narrowly.'"  Id. at 73,

17  112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed

18  or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp,

19  926 F.2d 918, 919 (9th Cir. 1991).

20          In support of this claim, petitioner cites exhibit J attached to the petition.  Exhibit

21  J is a SHU Term Assessment Worksheet stating that petitioner was sentenced to an 8 month SHU

22  term for the distribution of a controlled substance.  The form also inexplicably indicates that the

23  term was assessed pursuant to Rule 3005c titled "Force and Violence."  Cal. Code Regs. tit. 15 §

24  3005c provides that inmates shall not willfully commit or assist another person in the

25  commission of a violent injury to any person or persons.

26  \\\\\

1    Cal. Code Regs. tit. 15 § 3341.5(c)(2)(B) provides that a determinate period of

2    confinement in SHU may be established for an inmate found guilty of a serious offense listed in

3    section 3315 of Title 15.  Section 3315(a)(2)(D) lists possession of a controlled substance as a

4    serious offense.  Section 3341.5(c)(9)(E) states that a typical SHU term for distributing

5    controlled substances should be 9 months.  Petitioner's 8 month SHU term was clearly

6    authorized by the regulations.

7    It is unclear why the SHU Term Assessment Worksheet cited § 3005c.  It appears

8    that the citation to this section was in error and harmless as petitioner's SHU term was

9    authorized by state law.  Therefore, petitioner's SHU term did not violate fundamental fairness.

10   After independently reviewing the record, the court finds that the denial of this claim by the state

11   courts was neither contrary to nor an unreasonable application of clearly established Supreme

12   Court authority.  Accordingly, this claim should be denied.

13                     H.  Claim 10: Inadequate Investigative Officer

14   Petitioner contends that the investigative officer appointed to assist him, Officer

15   Feryance, was inadequate.  "Where an illiterate inmate is involved...or where the complexity of

16   the issue makes it unlikely that the inmate will be able to collect and present the evidence

17   necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow

18   inmate, or...to have adequate substitute aid...from the staff or from a[n] inmate designated by the

19   staff."  Wolff, 418 U.S. at 570, 94 S. Ct at 2982.

20   Petitioner contends that Officer Feryance failed to question witnesses McCoy,

21   Meadows, Shampre or Collins, and failed to produce inmate Collins at the hearing.  Petitioner

22   also contends that Officer Feryance also failed to give petitioner non-confidential information

23   including the last three cell searches from 4-8-02 and before.

24   In his report, Officer Feryance stated that on May 15, 2002, he interviewed

25   petitioner.  Answer, Exhibit 4.  At that time, petitioner requested the following witnesses:

26   Weston, Shambre, Meadows, McCoy, Rowan ,Valencia and inmate Collins.  Id.  The report also

1 indicates that petitioner asked Officer Feryance to ask Correctional Officer Weston several

2 questions.  Id.  Officer Weston's answers to those questions are contained in the report.  Id.

3          The report does not state that petitioner asked Officer Feryance to question

4 witnesses McCoy, Meadows, Shampre or Collins before the hearing.  For this reason, the court

5 does not find that Officer Feryance failed to perform adequately as petitioner's staff assistant.  In

6 any event, as discussed above, petitioner has not demonstrated that McCoy, Shampre, Meadows

7 or Collins would have been able to provide any evidence in support of his defense.  Therefore,

8 Officer Feryance's alleged failure to interview these witnesses prior to the hearing was harmless.

9          Petitioner also complains that Officer Feryance did not produce inmate Collins at

10 the hearing.  Officer Feryance's report states that petitioner requested that inmate Collins be a

11 witness.  Nothing in the record explains why Lieutenant Adams did not respond to this request.

12 Assuming it was Lieutenant Feryance's responsibility to obtain inmate Collins's presence at the

13 hearing, any error was harmless because petitioner has not demonstrated that inmate Collins

14 would have been able to provide any exonerating testimony.

15          Petitioner also claims that Officer Feryance failed to provide him with information

16 regarding the last three cell searches from 4-8-02 and before.  Officer Feryance's report indicates

17 that petitioner's request for the last three cell searches from 4-8-02 and before was granted.  Id.

18 Therefore, the basis of the instant claim is unclear.  Assuming Officer Feryance did not actually

19 provide petitioner with these documents, it is unclear how information regarding these cell

20 searches would have aided petitioner's defense.  Therefore, Officer Feryance's alleged failure to

21 provide petitioner with this information was harmless.

22          After independently reviewing the record, the court finds that the denial of this

23 claim by the state courts was neither contrary to nor an unreasonable application of clearly

24 established Supreme Court authority.  Accordingly, this claim is denied.

25 \\\\\

26 \\\\\

21

1    I. <u>Claim 11: Evidence Tampering</u>

2    Petitioner claims that Lieutenant Adams failed to put information in his rules

3    violation report that would have proved petitioner's innocence.  Petitioner contends that

4    Lieutenant Adams omitted the following information: 1) Officer Weston's statement that he

5    testified as a witness in inmate Collins's parole suitability hearing that another officer told him

6    that petitioner was selling drugs to pay off a gambling debt; 2) Officer Weston's statement that

7    when he sees traffic in a cell or a change in an inmate's personality, he searches the cell; 3)

8    Sergeant Rowan's statement that all officers who participate in a cell search prepare a report; 4)

9    on July 21, 2002, Lieutenant Adams tried to reach McCoy, Meadows and Shampre by phone; 5)

10   the hearing actually ended on July 31, 2002.

11   "The due process requirements for a prison disciplinary hearing are in many

12   respects less demanding than those for criminal prosecution, but they are not so lax as to let stand

13   the decision of a biased hearing officer who dishonestly suppresses evidence of innocence."

14   <u>Edwards v. Balisok</u>, 520 U.S. at 647, 117 S. Ct. at 1588.  The evidence cited above would not

15   have established petitioner's innocence.  As discussed above, at the hearing petitioner admitted

16   that he owned the fan.  During the investigation, he told the investigating officer that his cellmate

17   was not aware of the fan.  While petitioner suggested that the heroin belonged to another inmate,

18   the evidence cited above would not have helped him prove who this inmate was.  As discussed

19   above, petitioner undercut his own defense by refusing to disclose the identity of the inmate from

20   whom he bought the fan.

21   By failing to include the information cited above in his report, Lieutenant Adams

22   did not suppress evidence of petitioner's innocence.  Moreover, due process does not require that

23   the report from the disciplinary hearing contain every statement made at the hearing.  <u>Wolff</u>, 418

24   U.S. at 564-571, 94 S. Ct. at 2978-2982.

25   The denial of this claim by the California courts was neither contrary to nor an

26   unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

1  should be denied.

2  Accordingly, IT IS HEREBY ORDERED that:

3  1.  The February 15, 2005, order to show cause is discharged;

4  2.  Petitioner's March 31, 2005, motion to amend and May 26, 2005, motion to

5  file a second amendment are denied;

6  IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

7  habeas corpus be denied.

8  These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within ten days after service of the objections.  The parties are advised

14  that failure to file objections within the specified time may waive the right to appeal the District

15  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: 9/12/05

17  /s/ Gregory G. Hollows

18  _____
   GREGORY G. HOLLOWS
19  UNITED STATES MAGISTRATE JUDGE

ggh:kj
20  grave1279.157

21

22

23

24

25

26

23